2024 IL App (1st) 221677-U

FIRST DIVISION
March 4, 2024

No. 1-22-1677

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 03 CR 17306 |
| PABLO AGUILAR, | ) | |
| | ) | Honorable |
| Petitioner-Appellant. | ) | Joanne Rosado, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Coghlan concurred in the judgment.

**O R D E R**

¶ 1    *Held*: Appointed postconviction counsel rendered unreasonable assistance (Ill. S. Ct. 651(c) (eff. July 1, 2017)) by failing to amend the petition to include affidavits or any other documentary evidence to support the allegations of ineffective assistance of trial counsel and thereby avoid dismissal of the petition for failure to comply with the requirements of section 122-2 of the Post-Conviction Hearing Act. See 725 ILCS 5/122-2 (West 2020). The matter is reversed and remanded for new second-stage proceedings and the appointment of new postconviction counsel.

¶ 2    After a jury trial in the circuit court of Cook County, the petitioner, Pablo Aguilar, was found guilty of first-degree murder and sentenced to 36 years' imprisonment. After his conviction and sentence were affirmed on direct appeal, the petitioner retained private counsel and filed a petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). Therein private counsel alleged, *inter alia*, ineffective assistance of trial counsel on the basis of counsel's failure to interview and call "numerous witnesses" at the petitioner's trial and to investigate his claims of police coercion. The petition did not include any affidavits or other supporting documentation. After the petition was automatically advanced to the second stage of postconviction proceedings, private counsel withdrew, and the circuit court appointed the Office of the Public Defender to represent the petitioner. Over a decade later, appointed postconviction counsel filed a certificate pursuant to Illinois Supreme Court Rule 651(c) (Ill. S. Ct. 651(c) (eff. July 1, 2017)) stating that he would not amend the original petition. The State then filed a motion to dismiss, asserting that the petition was conclusory and lacked supporting affidavits in violation of section 122-2 of the Act (725 ILCS 5/122-2 (West 2020)). The circuit court agreed and granted the State's motion. The petitioner now appeals contending that his appointed postconviction counsel failed to provide a reasonable level of assistance as required under Rule 651(c) (eff. July 1, 2017). For the following reasons, we reverse and remand with instructions.

¶ 3                                II. BACKGROUND

¶ 4    Because the record before us is voluminous as it spans over nearly two decades, we set forth only those facts and procedural history relevant to the resolution of this appeal.

¶ 5    In July 2003, together with codefendants, Daniel Aguirre, Octavio Anima, Miguel Nunez, Natalio Ramirez, and Jesus Sanchez, the petitioner was charged with four counts of first degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 2002)), three counts of aggravated battery (720 ILCS

5/12-4(a), (b)(1), (b)(8) (West 2002)) and one count of mob action (720 ILCS 5/25-1(a)(1) (West 2002)) for his involvement in the July 14, 2003, beating of the victim, Pablo Valdez, which resulted in the victim's death.

¶ 6     After an initial mistrial, in November 2006, the petitioner and codefendant Aguirre, were tried simultaneously before separate juries. During the second trial, the State *nolle prossed* all counts except for felony murder predicated on aggravated battery committed on a public way.

¶ 7     Summarized, the evidence adduced at this trial revealed the following. On the evening of July 13, 2003, the victim drove five of his friends (Graciela Gonzalez, Alejandra Hernandez, Manuel Perez, Alfredo Soto, and Christian Ortiz) to the Chicago lakefront, where they drank beer and talked for hours. On the way back, the six of them stopped to pick up another friend, Nancy Ramirez, from her home at 72nd Street and South Springfield Avenue. Shortly before 2 a.m., all seven proceeded to the El Gallo de Oro restaurant ("El Gallo") at 63rd Street and South Sacramento Avenue to get a snack. Once there, the three women (Hernandez, Gonzalez, and Ramirez) went into the restaurant and sat at a table with a window at the front, while the four men (the victim, Perez, Soto, and Ortiz) remained outside.

¶ 8     At that moment three vehicles (a blue GMC Suburban, a black Ford Bronco, and a white car, possibly an Oldsmobile Bonneville) drove by heading eastbound on 63rd Street. As they passed the four men on the sidewalk (the victim, Perez, Soto, and Ortiz), the occupants of the three vehicles yelled "Two-Six killer," "Two-Six Ambrose killer," and "Two-Six," and flashed a Latin Saints street gang sign. In response, Perez, who was a member of the Gangster Disciples, and did not like the Latin Saints, made a sign of disrespect. The GMC Suburban then attempted a U-turn but instead drove at the four men on the sidewalk, nearly hitting them before striking a parked car.

¶ 9     Based on various accounts elicited from different eyewitnesses, between eight to ten men

holding sticks then jumped out of the vehicles being driven by the Latin Saints. Perez, Ortiz, Soto, and the victim fled in different directions. Ortiz ran into the El Gallo restaurant and hid in the bathroom, while Perez, Soto, and the victim fled west on 63rd Street, before turning north onto Sacramento Avenue.

¶ 10    Perez split off from Soto and the victim at the intersection of Sacramento Avenue and the T-alley north of 63rd Street. Perez continued north on Sacramento, while Soto and the victim turned into the T-alley. Once in the alley, the victim ran left, while Soto ran right. Soto jumped a fence, hid in a back yard for about 10 minutes, and then walked home. Having lost their pursuers, both Perez and Soto subsequently returned to El Gallo restaurant.

¶ 11    In the meantime, the three women, who had been sitting inside the El Gallo restaurant observed Ortiz walking quickly into the bathroom and a group of men running on 63rd Street and then turning north onto Sacramento Avenue. The women walked out of the restaurant and attempted to follow the group but lost sight of it on Sacramento Avenue just north of 63rd Street. Walking into the west alley, the women reached the T-intersection with the north-south alley between Sacramento Avenue and Whipple Street, where the victim would later be discovered. There, Gonzalez saw five or more men that she did not recognize walk quickly towards them. Gonzalez, however, saw nothing past the men in the alley to the north.

¶ 12    Returning to El Gallo, the three women reunited with Perez, Ortiz and Soto but could not locate the victim. They repeatedly tried calling him on his cell phone and looked for him in the neighboring streets but with no success. The six friends later learned that the victim had been beaten and died. Besides Perez, no other members of the victim's group belonged to any street gang.

¶ 13    The evidence at the petitioner's trial further established that at about 2 a.m. on July 14,

2013, Chicago Police Officer Brian Treacy and his partner were inside an unmarked squad car on the corner of 63rd Street and Sacramento Avenue, when they observed a GMC Suburban drive at a high speed into the Marathon gas station on the corner and park in front. Officer Treacy also observed a white vehicle drive west on 63rd Street, make a U-turn and then pull into the same gas station. Believing that the gas station was about to be robbed, the officer drove into the gas station and exited his vehicle. At that moment, five individuals ran south from behind the gas station. Officer Treacy and his partner detained all five individuals and called for back-up.

¶ 14    Soon thereafter, the officers received a call of an assault in progress in the T-alley behind the gas station. Officer Treacy went to the alley and saw a lifeless body with blood everywhere. He returned to the gas station, noticed a bloodlike substance on some of the detained individuals' shoes and pants, and recovered their shoes for evidence.

¶ 15    Officer Treacy acknowledged that the petitioner was not one of the individuals that he observed running from the alley to the gas station. Instead, he was one of the men that the officer found seated in the Suburban. Officer Treacy acknowledged that the petitioner had no blood on his hands. After the petitioner was transported to the police station along with the remaining individuals that were arrested at the gas station, Officer Treacy collected his pants and shoes for the purpose of DNA testing.

¶ 16    A Chicago police evidence technician responding to the scene of the crime that morning testified that he discovered the lifeless body of the victim lying face up in the alley behind the gas station. The victim had massive injuries to the head and face. The evidence technician observed several pieces of wood, a smaller cylindrical stick, and a broken Corona beer bottle on the ground next to the victim's body. Among other things, the evidence technician collected blood samples from the body and the ground.

¶ 17    Blood samples collected from the victim were tested against the clothes recovered from the petitioner upon his arrest. DNA testing of the petitioner's pants revealed that they contained the victim's blood.

¶ 18    The evidence at trial further established that after being Mirandized at the police station on July 14, 2003, the petitioner spoke to two Chicago police detectives separately, and told each of them that he had chased the victim with several other men, thrown a Corona beer bottle at him, and then hit him and kicked him in the face. The petitioner also agreed to give a videotaped statement to the police.

¶ 19    That videotaped statement was published to the jury. In it the petitioner admitted, *inter alia*, that in the early morning hours of July 14, 2003, he was with six other individuals, inside one of the three vehicles that encountered the victim's group near Sacramento Avenue. According to the petitioner, the victim's group threw bottles at their vehicles, which precipitated his group to jump out of their respective vehicles and chase their rivals north on Sacramento Avenue. After the rival group split in different directions, the petitioner's group followed one of the men into the T-alley behind the gas station. The petitioner saw two of his friends trip the man, step on the man's head, stomp and kick him. When the man fell to the ground, the petitioner got closer and threw a Corona bottle at his chest. Everyone else in the group was still stomping on the man, so the petitioner joined in and stomped him a few times. While the petitioner's friends continued kicking the man, the petitioner looked around and noticed a board protruding from a garbage can. Encouraged by his friends, the petitioner picked up the board and hit the prone man several times on the head. The petitioner then dropped the board and ran to the gas station, where he was arrested by an officer who pulled up in an unmarked car.

¶ 20    The victim's autopsy revealed that he died as a result of multiple injuries and that the

manner of death was homicide.

¶ 21    After the State's case-in-chief, in petitioner's defense, codefendant Aguirre testified, *inter alia*, that he was the one who picked up the board and hit the victim with it instead of the petitioner. According to Aguirre, the petitioner never had the board in his hands. Aguirre admitted, however, that after he hit the victim with the board, he observed his friends, including the petitioner, kick the victim a few times.

¶ 22    After deliberations, the jury found the petitioner guilty of felony murder predicated on aggravated battery committed on a public way. The court subsequently sentenced the petitioner to 36 years' imprisonment.

¶ 23    On appeal, the petitioner argued that: (1) his felony murder conviction must be reversed because the predicate offense of aggravated battery consisted of the same acts and was committed with the same felonious purpose as the acts causing the victim's death; (2) the circuit court erred by refusing to provide substantive answers to the jury's questions during deliberations and by responding to those questions outside of the petitioner's presence; and (3) trial counsel was ineffective for: (a) inaccurately telling the jury in opening statements that the petitioner would testify at trial and that no DNA evidence connected him to the crime; (2) failing to argue in his motion to suppress that the petitioner had been denied his request for counsel during his interrogation; and (3) failing to object to the circuit court's decision not to answer the jury's questions during deliberations. We affirmed the petitioner's conviction and sentence on September 30, 2009. See *People v. Aguilar*, No. 1-07-0264 (Sept. 30, 2009) (unpublished order pursuant to Illinois Supreme Court rule 23).

¶ 24    On October 27, 2010, the petitioner's private attorney filed the instant postconviction petition alleging: (1) an error in the charging instrument and (2) ineffective assistance of trial

counsel. With respect to trial counsel's ineffectiveness, the petition alleged that counsel: (1) failed to interview "numerous witnesses"; (2) failed to investigate petitioner's claims of police coercion; (3) misinformed the jury that no DNA evidence linked the petitioner to the crime; (4) failed to challenge the State's DNA evidence at trial; (5) failed to object to certain out-of-court testimony; and (6) failed to present mitigating evidence at the petitioner's sentencing hearing.

¶ 25 The petition did not name any of the "numerous witnesses" that the petitioner had allegedly given to trial counsel, nor did it attach any affidavits from either the petitioner or any of those witnesses revealing the substance of their proposed testimony. Similarly, the petition did not elaborate on what trial counsel's investigation into the claims of police coercion would have discovered, or how counsel could have challenged the State's DNA evidence at trial. The petition also did not state what mitigating evidence counsel should have offered at the sentencing hearing, or how that evidence would have impacted the petitioner's sentence.

¶ 26 In addition, the petition did not even include a verification affidavit. Instead, private counsel attached his own affidavit attesting that because of a lockdown at Menard Correctional Center, where the petitioner was being housed, the petitioner was unable to obtain the services of a notary to verify the affidavit for his petition. Counsel further attested that he was working with the Illinois Department of Corrections (IDOC) to obtain this document.

¶ 27 After the circuit court docketed the petition on November 17, 2010, it automatically proceeded to the second stage of postconviction proceedings.

¶ 28 For the next three years, private counsel appeared before the circuit court requesting that the case be continued, first so that he could obtain the verification affidavit from the petitioner, with whom he had limited contact because the prison continued to remain on lockdown, and subsequently so that he could investigate additional claims that the petitioner wished to raise in an

8

amended petition.

¶ 29    On May 16, 2013, private counsel told the circuit court that he had finally obtained the notarized verification affidavit from the petitioner but that because of "a flood in his [home's] basement" which impacted the petitioner's file he needed more time to recreate the document.

¶ 30    Three months later, on August 12, 2013, private counsel informed the court that after his most recent telephone conversation with the petitioner, he understood that the petitioner did not wish to be represented by him any longer, and instead wished to proceed *pro se*.

¶ 31    On September 9, 2013, the petitioner appeared in court, and agreed with his private attorney's suggestion, that he be given three weeks to decide whether he wished to continue their client-attorney relationship.

¶ 32    On September 30, 2013, the petitioner informed the court that he wished to proceed *pro se*. After being admonished by the circuit court about the pitfalls of proceeding without an attorney, the petitioner requested the appointment of stand-by counsel, which the court denied. Private counsel then withdrew from the case, and the petitioner was given additional time to obtain his records and to amend his original petition.

¶ 33    On January 9, 2014, the petitioner informed the court that he had not yet received any of his records or transcripts from private counsel and requested more time to amend his petition because "he wanted to get it right." The circuit court then informed the petitioner, for the first time, that because the petition was at the second stage of postconviction proceedings, he was entitled to the appointment of counsel if he could not afford one. The court asked the petitioner whether he wanted the public defender to be appointed to represent him, to which the petitioner responded, "If it's available, I'd like that." The court then appointed the Office of the Public Defender to

represent him.

¶ 34    For the next eight years, the petitioner was represented by three different attorneys from that office. The first public defender, Lindsay Huge, appeared on May 22, 2014, and informed the circuit court that he had just received a copy of the original postconviction petition. After spending the next four years trying to obtain the record and transcripts, and investigating the case, on March 24, 2016, Huge indicated that he intended to file a motion for leave to subpoena boxes of "unmarked, unclassified," and "stray" police records from the basement of Area One police station, where the petitioner had made his incriminating statement to the police and which were now apparently in the possession of a civil rights attorney.

¶ 35    On May 11, 2016, the circuit court granted Huge's request for leave to subpoena those records. On November 17, 2016, Huge informed the court that he had received the records and needed more time to review them, complete his investigation, and amend the petition.

¶ 36    On July 11, 2018, Huge stated that he was still waiting for certain information from the petitioner, which "would take some time." Huge also told the court that because he was leaving the Office of the Public Defender the case was likely to be reassigned to new counsel.

¶ 37    On November 14, 2018, the Office of the Public Defender reassigned the petitioner's case to public defender, Armando Sandoval. After numerous continuances requested by other attorneys in the public defender's office, Sandoval appeared in court on May 10, 2019, requesting more time to review the case. Nine months later, on February 17, 2020, Sandoval requested more time to obtain the petitioner's verification affidavit.

¶ 38    On October 2, 2020, still without the benefit of a verification affidavit, Sandoval filed a certificate pursuant to Supreme Court Rule 651(c) attesting that he had consulted with the petitioner by "phone, mail, electronic means, or in person to ascertain his contentions of

deprivation of constitutional rights." Sandoval further attested that he examined the record of the proceedings, including the common law record, report of proceedings and any exhibits in the possession of the circuit court. After his review and his consultation with the petitioner, Sandoval investigated and researched the petitioner's claims and came to the conclusion that amending or supplementing the original petition would be unnecessary for an adequate presentation of the petitioner's claims.

¶ 39    On May 18, 2021, yet a third public defender, Dennis Brown, appeared on the petitioner's behalf. Brown acknowledged that his predecessor Sandoval had filed a 651(c) certificate and that he was now waiting for the State to file a motion to dismiss to see if a response was necessary.

¶ 40    Nine months later, on February 1, 2022, the State filed its motion to dismiss the postconviction petition. Therein, the State argued, *inter alia*, that the petitioner's claims were procedurally barred because the petitioner had failed to comply with the pleading requirements of the Act, *i.e.,* to attach a notarized affidavit verifying his petition. See 725 ILCS 5/1-122-1(b) (West 2020). The State also asserted that dismissal was proper because the petitioner had failed to support his claims with any affidavits, records, or other factual evidence, or in the very least, to explain their absence as is required under section 122-2 of the Act (725 ILCS 5/2-122 (West 2020)). Without any such evidentiary support, the State asserted that the claims were conclusory and should be dismissed.

¶ 41    On August 11, 2022, Brown tendered the petitioner's verification affidavit to the circuit court. That affidavit, executed on June 16, 2022, simply attested that, to the best of the petitioner's knowledge, the facts set out in the petition were true and correct.

¶ 42    On October 27, 2022, exactly 12 years after the original postconviction petition was filed by private counsel, the circuit court held a hearing on the State's motion to dismiss. At that hearing,

the State reiterated that the original petition had not been verified by the petitioner. The State then argued that even with the benefit of counsel the petitioner had failed to provide the requisite documentation to support his claims of ineffective assistance of trial counsel. According to the State, the petitioner had failed to identify which witnesses were known to trial counsel that counsel failed to investigate. In addition, he failed to provide any affidavits as to what those witnesses would have said at trial.

¶ 43    In response, Brown argued that while the original petition was not initially verified, private counsel had explained that he was under a deadline and could not reach the petitioner to obtain a verification affidavit because of the prison lockdown. In addition, Brown pointed out that since then he himself has cured this defect by providing the petitioner's verification affidavit to the court.

¶ 44    The State acknowledged the receipt of this verification affidavit, but nonetheless asserted that dismissal was proper because the petition did not include any affidavits or other documents providing factual support for the petitioner's ineffective assistance of counsel claims.

¶ 45    Brown responded that such affidavits were unnecessary because the original petition was not reliant on individual errors committed by trial counsel but rather on the cumulative effect of those errors. Brown argued that the petition made a substantial showing of ineffective assistance of trial counsel and that the factual support for this claim was found in the record itself. Finally, Brown stated that he was adopting the arguments raised in the original petition as his response to the State's motion to dismiss.

¶ 46    The State responded that regardless of whether the petition alleged cumulative or individual error by trial counsel, the petitioner was required to support this claim with affidavits or other documentary support to survive second-stage dismissal. To the extent that the claimed error was supported by the record, the State argued that it was barred by forfeiture as it could have

been but was not addressed on direct appeal.

¶ 47 After hearing arguments by the parties, the circuit court granted the State's motion to dismiss. The court found that there was no documentary support for the petitioner's claims, and that therefore, taking all the petitioner's allegations as true, the petition failed to make a substantial showing of a constitutional violation. The petitioner now appeals.

¶ 48                                    II. ANALYSIS

¶ 49 On appeal, the petitioner does not argue the merits of his petition.[1] Instead, he solely contends that he did not receive reasonable assistance from his appointed postconviction counsel. In this respect, the petitioner asserts that appointed postconviction counsel: (1) failed to amend the original petition to provide any factual basis for the otherwise conclusory claims raised therein; (2) secure affidavits to support those claims; or (3) otherwise explain why greater factual specificity and/or supporting affidavits were unavailable. The petitioner therefore urges this court to reverse the circuit court's dismissal order and remand for further second-stage proceedings with instructions that postconviction counsel amend the petition to satisfy the pleading requirements of the Act or explain why his efforts to do so were unsuccessful. For the following reasons, we agree.

¶ 50 The Act (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a three-stage process by which criminal defendants may challenge their convictions on the basis of a "substantial deprivation of federal or state constitutional rights." *People v. Tenner*, 175 Ill. 2d 372, 378 (1997); *People v. Cotto*, 2016 IL 119006, ¶ 26; *People v. Tate*, 2012 IL 112214, ¶ 8; *People v. Lenoir*, 2021 IL App (1st) 180269, ¶ 27. A postconviction action is a collateral attack on a prior conviction and sentence, and "is not a substitute for, or an addendum to, direct appeal." *People v. Kokoraleis*, 159 Ill. 2d

---

[1] Because the petitioner does not raise these contentions, nor argues the merits of his claims, he has forfeited any such arguments for purposes of this appeal. *People v. Cotto*, 2016 IL 119006, ¶ 49; *People v. Bass*, 2018 IL App (1st) 152650, ¶ 10; Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (points not raised on appeal are forfeited).

325, 328 (1994); see also *Lenoir*, 2021 IL App (1st) 180269, ¶ 27. Accordingly, "[i]ssues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised but were not are forfeited." *Lenoir*, 2021 IL App (1st) 180269, ¶ 27.

¶ 51 Proceedings under the Act are commenced by the filing of a petition in the circuit court that contains the allegations pertaining to the substantial denial of the petitioner's constitutional rights. *Cotto*, 2016 IL 119006, ¶ 26; *Tate*, 2012 IL 112214, ¶ 9; *People v. Madison*, 2023 IL App (1st) 221360, ¶ 31. At the first stage, the circuit court must, within 90 days after the petition is filed and docketed, independently review the petition, and determine whether the allegations, if taken as true, demonstrate a constitutional violation or whether they are frivolous or patently without merit. *Id.*; see also 725 ILCS 5/122-2.1(a)(2) (West 2020); *People v. Perkins*, 229 Ill. 2d 34, 42 (2007).

¶ 52 If, as here, the petition is automatically advanced to second stage proceedings, the circuit court may appoint an attorney for the petitioner if he cannot afford one and the State is entitled to file responsive pleadings. 725 ILCS 122-2.1(b) (West 2020); *Madison*, 2023 IL App (1st) 221360, ¶ 32. During the second stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a violation of constitutional rights. 725 ILCS 5/122-6 (West 2020); *Cotto*, 2016 IL 119006, ¶ 27; *Tate*, 2012 IL 112214, ¶ 10; *Madison*, 2023 IL App (1st) 221360, ¶ 32. In doing so, the circuit court may not "engage in fact finding or credibility determinations," but must take all well-pleaded facts in the petition as true unless positively rebutted by the original trial record. *People v. Domagala*, 2013 IL 113688, ¶ 35; *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). If the circuit court determines that the petitioner made a substantial showing of a constitutional violation, the petition proceeds to the third stage for an evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 35. Conversely, where no substantial

showing is made the petition is dismissed. *Id*.

¶ 53 The right to counsel in postconviction proceedings is statutory and petitioners are entitled only to a "reasonable" level of assistance. See *People v. Custer*, 2019 IL 123339, ¶ 30; *People v. Johnson*, 2018 IL 122227, ¶ 16; *Cotto*, 2016 IL 119006, ¶¶ 29-30; *People v. Hardin*, 217 Ill. 2d 289, 299 (2005) (appointment of counsel in postconviction proceedings is "a matter of legislative grace" and not a constitutionally guaranteed right). To ensure a reasonable level of assistance, certain duties are prescribed to postconviction counsel by Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). Under that rule, postconviction counsel must: (1) consult with the petitioner (by mail or in person) to ascertain his contentions of constitutional deprivations; (2) examine the record of the trial proceedings; and (3) make any amendments to the original petition necessary for an adequate representation of the petitioner's contentions. *Id*.; *Cotto*, 2016 IL 119006, ¶¶ 29-30; *Perkins*, 229 Ill. 2d at 42.

¶ 54 Compliance with the rule is mandatory and its purpose is to have postconviction counsel "shape" the petitioner's constitutional claims "into the proper legal form and to present those complaints to the court." *People v. Addison*, 2023 IL 127119, ¶ 19. The filing of a Rule 651(c) certificate creates a rebuttable presumption that postconviction counsel provided reasonable assistance. *Id.* ¶ 21. The petitioner bears "the burden of overcoming that presumption by demonstrating that counsel failed to substantially comply with the duties set out in Rule 651(c)." *People v. Rivera*, 2016 IL App (1st) 132573, ¶ 36. The petitioner may do so, *inter alia,* by demonstrating that postconviction counsel did not: (1) "make all necessary amendments" to his petition (*Addison*, 2023 IL 127119, ¶ 21); or (2) understand that affidavits or supporting materials were required to survive dismissal (*People v. Urzua*, 2023 IL 127789, ¶¶ 62-64). We review whether postconviction counsel provided unreasonable assistance *de novo*. *Addison*, 2023 IL

127119, ¶ 17.

¶ 55    In the present case, the petitioner acknowledges that postconviction counsel filed a Rule 651(c) certificate and that he complied with the first two duties imposed by that Rule. He nonetheless asserts that the record rebuts the presumption that counsel acted reasonably because it shows that counsel failed to amend his petition to shape his ineffective assistance of trial counsel claims into proper legal form and to attach supporting affidavits or other documents, which were necessary to avoid dismissal of his claims.

¶ 56    The State responds that because the petitioner was represented by four separate postconviction counsels over a span of 12 years, all of whom stated on the record that they investigated the petitioner's claims, based on the Rule 651(c) certificate, we must presume that the lack of affidavits or other supporting documentation was the result of counsels' inability to obtain them. For the following reasons, we disagree with the State.

¶ 57    Section 122-2 of the Act mandates that a postconviction petition "clearly set forth the respects in which the petitioner's constitutional rights were violated" and that it "*shall* have attached thereto affidavits, records, or other evidence supporting its allegations or *shall* state why the same are not attached." 725 ILCS 5/122-2 (West 2020). The purpose of affidavits or other supporting documentation is to provide "objective or independent" corroboration of the petition's verified allegations. *People v. Collins*, 202 Ill. 2d 59, 67 (2002).

¶ 58    Our supreme court has repeatedly held that the failure to attach affidavits or other supporting documentation or explain its absence is "fatal to the petitioner's claims" (*People v. Turner*, 187 Ill. 2d 406, 414 (1999)) as it "renders the petition insufficient to require an evidentiary hearing" (*People v. Johnson*, 154 Ill. 2d 227, 240 (1993)). See *People v. DeAvilla*, 333 Ill. App. 3d 321, 323 (2002) (citing *Collins*, 202 Ill. 2d at 66-67) (the failure to attach affidavits or explain

their absence "is fatal to a postconviction petition and by itself justifies a summary dismissal."); *People v. Walker*, 2019 IL App (3d) 170374, ¶ 13 (same); *People v. Delton*, 227 Ill. 2d 247, 255 (2008) (same); see also *People v. Coleman*, 183 Ill. 2d 366, 381 (1998) ("Nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act."); *People v. Edwards*, 197 Ill. 2d 239, 246 (2001) (without the necessary affidavits or other evidence attached to the petition, the petitioner cannot meet the second-stage burden of a substantial showing of a constitutional violation).

¶ 59    Accordingly, where, as here, postconviction counsel adopts a verified petition, "he [is] required to comply with section 122-2 of the Act." *Urzua*, 2023 IL 127789, ¶ 60. At a minimum, this means that counsel must provide, or in the very least attempt to provide "evidentiary support for claims raised in the post-conviction petition." *Johnson*, 154 Ill. 2d at 245. Where counsel cannot do so, he has a duty to explain why such evidentiary support is unavailable. See 725 ILCS 5/122-2 (West 2020) (the petition "*shall* state why [affidavits, records, or other supporting documents] *** are not attached."). Otherwise, he risks having the petition dismissed for failure to comply with the requirements of section 122-2 of the Act. See *Turner*, 187 Ill. 2d at 414 (the failure to attach affidavits or other documentary support for the allegations raised in the petition, or to explain their absence is "fatal" to a postconviction petition) *Johnson*, 154 Ill. 2d at 240 ("the absence of affidavits, records or other evidence in support of the post-conviction petition renders the petition insufficient to proceed to an evidentiary hearing"); *Delton*, 227 Ill. 2d at 155 (same).

¶ 60    In the present case, it is undisputed that appointed postconviction did not attach any affidavits or other documentation supporting the petitioner's allegations, nor attempted to explain their absence in any way.

¶ 61    While the State is correct that ordinarily we "may reasonably presume that post-conviction

counsel made a concerted effort to obtain affidavits [or other documentary evidence] in support of the post-conviction claims but was unable to do so," this presumption does not apply where it is "flatly contradicted by the record." *Johnson*, 154 Ill. 2d at 241; *People v. Waldrop*, 353 Ill. App. 3d 244, 250 (2004); *People v. Johnson*, 2022 IL App (1st) 190258-U, ¶ 37; *People v. Atkins*, 2022 IL App (1st) 200302-U, ¶ 27; *People v. Patterson*, 2022 IL App (3d) 200099-U, ¶ 11.

¶ 62    Very recently in *Urzua*, our supreme court held that the presumption of reasonable assistance of postconviction counsel created by the filing of a Rule 651(c) certificate was rebutted where the record revealed that postconviction counsel failed to realize that in order to comply with section 122-2 of the Act and avoid dismissal of the petition it was necessary to amend the verified petition to attach a notarized affidavit supporting the petitioner's claim of actual innocence. *Urzua*, 2023 IL 127789, ¶¶ 62-64. In that case, the petitioner filed a *pro se* postconviction petition alleging actual innocence, which was supported by an unnotarized statement of a witness. *Id.* ¶ 61. After the petition was advanced to the second stage of proceedings, postconviction counsel adopted the *pro se* petition without making any amendments. *Id.* ¶ 64. The record showed that counsel believed that the "unnotarized statement" of the witness "was sufficient to advance the petition and survive a second-stage dismissal." *Id.* ¶ 63. Specifically, postconviction counsel erroneously argued in response to the State's motion to dismiss that the petition "was not required to have the 'affidavit' notarized because it was a factual question to be resolved at a third-stage evidentiary hearing." *Id.*

¶ 63    Our supreme court held that although postconviction counsel had filed a facially valid Rule 651(c) certificate, the presumption of reasonable assistance created by that certificate was belied by counsel's: (1) "failure to amend the petition or the attached unnotarized statement and [(2)] *** [his] misstatement of the Act's affidavit requirements." *Id.* ¶ 64. Accordingly, the court concluded that counsel did not render reasonable assistance and reversed the circuit court's second-stage

18

dismissal, remanding the case for further proceedings with new postconviction counsel. *Id.* ¶ 65.

¶ 64    After reviewing the record in this case, we find that appointed postconviction counsel, just as the counsel in *Urzua*, demonstrated a fundamental misunderstanding of his obligations under the Act and therefore failed to provide reasonable assistance.

¶ 65    The record shows not only that counsel failed to attach any evidentiary support for the claims asserted in the original petition, or to provide any explanation for their absence, but also that he was under the misapprehension that this was not necessary for the advancement of the petition to the third stage of postconviction proceedings.

¶ 66    In this respect, the record reveals that in response to the State's assertion that the petition should be dismissed because it failed to attach any affidavits or other supporting evidence, postconviction counsel argued that because the petitioner's claims were "not necessarily" of individual instances of ineffective assistance of trial counsel but rather of the cumulative effect of those errors the "support for th[e] claim[s] [wa]s found in the record itself."

¶ 67    "Counsel's argument was [clearly] wrong." *Urzua*, 2023 IL 127789, ¶ 63. Of the petitioner's six claims of ineffective assistance of trial counsel, three were plainly based on facts *dehors* the record, as they alleged that counsel failed to interview witnesses, investigate his claims of police coercion, and challenge the State's DNA evidence at trial. Even assuming that these allegations were intended to assert a cumulative error, rather than individual errors committed by trial counsel, there was no evidence whatsoever in the record which would have supported such a claim.

¶ 68    To the extent that the remaining three claims of counsel's ineffectiveness were based on the trial record, as pleaded, all three were defective, as a matter of law, and therefore would have required automatic dismissal. See *People v. Johnson*, 2021 IL 125738, ¶ 49 ("An otherwise

meritorious claim has no basis in law if *res judicata* or forfeiture bar the claim"). Specifically, the claim that counsel misinformed the jury that no DNA evidence linked the petitioner to the crime, was barred by *res judicata*, as it had already been argued and rejected on direct appeal. See *Lenoir*, 2021 IL App (1st) 180269, ¶ 27. Similarly, the claims that counsel failed to challenge certain out-of-court statements at the petitioner's trial, and that he failed to offer any mitigating evidence at his sentencing hearing were both forfeited as they could have been but were not raised on direct appeal. *Id*. Competent postconviction counsel should have known that the only way to overcome these obstacles would have been to argue ineffective assistance of appellate counsel. See *Turner*, 187 Ill. 2d at 406; *People v. Schlosser*, 2012 IL App (1st) 092523. Postconviction counsel here, however, did not. See *Addison*, 2023 IL 127119, ¶ 35 ("failure to allege ineffective assistance of appellate counsel when necessary to overcome forfeiture was a violation of rule 651(c).").

¶ 69     Without overcoming the obstacles of waiver and *res judicata* and providing any evidentiary support for the remaining claims raised in the petition, all of which were based on evidence that was not contained in the trial record, postconviction counsel left "virtually nothing for the circuit court to take as true" in assessing the postconviction petition at the second stage. *People v. Dixon*, 2018 IL App (3d) 150630, ¶ 20.

¶ 70     As pleaded, the ineffective assistance of trial counsel claims in the original petition were bereft of any factual or documentary support. Specifically, while the original petition alleged that trial counsel failed to interview and call "numerous witnesses" at the petitioner's trial, it did not name any of these "numerous witnesses" and did not state what their testimony would have been. Nor did it attach any affidavits from those witnesses, or in the very least, from the petitioner, naming the witnesses or detailing their would-be testimony.

¶ 71     Likewise, the petition alleged that trial counsel failed to investigate the police detectives to

corroborate the petitioner's claim that his confession had been coerced. The petition, however, provided no explanation or evidentiary support as to what such an investigation would have revealed. In addition, the claim that trial counsel failed to challenge the DNA evidence at the petitioner's trial was offered with no details or evidentiary support as to how that evidence could have been disputed.

¶ 72     Under this record, the circuit court was forced to dismiss the petition as conclusory and lacking any documentary support. See *Johnson*, 154 Ill. 2d at 240 (failure to attach affidavits or other supporting documentation or explain its absence "renders the petition insufficient to require an evidentiary hearing"); *Coleman*, 183 Ill. 2d at 381 ("Nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act.").

¶ 73     Accordingly, where postconviction counsel's own statements to the circuit court reveal that he was unaware of the basic pleading requirements of the Act, such that he mistakenly believed that the petitioner's claims of ineffective assistance of trial counsel could survive second-stage without affidavits or other supporting documentation, or, in the alternative, a claim of ineffective assistance of appellate counsel, we conclude that the petitioner has rebutted the presumption that postconviction counsel acted reasonably when he chose not to amend the original petition. See *Urzua*, 2023 IL 127789, ¶¶ 62-64 ("counsel's failure to amend he petition *** and [his] misstatement of the Act's affidavit requirements during argument on the State's motion to dismiss clearly rebutted *** the presumption of reasonable assistance"); *Patterson*, 2022 IL App (3d) 200099-U, ¶ 11 ("Where postconviction counsel misunderstands the law concerning when affidavits are necessary to support a postconviction claim, counsel fails to provide a reasonable level of assistance"); *Atkins*, 2022 IL App (1st) 200302-U, ¶ 27 ("The failure to be aware of the Act's basic requirements with respect to attaching evidentiary support to the claims alleged in the

petition cannot be considered 'reasonable assistance.' "); *Johnson*, 2022 IL App (1st) 190258-U, ¶¶ 38-30 (finding that postconviction counsel did not provide reasonable assistance where "it is quite apparent that counsel was not familiar with the record or the basic requirements of the Act."); see also *Addison*, 2023 IL 127119, ¶ 35 ("We fail to see how it can be reasonable assistance of counsel for an attorney to identify claims worth pursuing but then fail to shape them into proper form."); see also *Dixon*, 2018 IL App (3d) 150630, ¶ 17 (holding that postconviction counsel failed to comply with Rule 651(c) by failing to amend the petition that "contained virtually no specific factual allegations to support he general claims it asserted").

¶ 74    The State next asserts that regardless of whether we find that postconviction counsel failed to comply with Rule 651(c) because the petitioner effectively concedes that his claims have no merit, by not arguing them on appeal, any deficiency in counsel's representation was necessarily harmless, such that remand is unnecessary.

¶ 75    Contrary to the State's position, however, our supreme court has recently held that where postconviction counsel fails to comply with Rule 651(c), remand is required regardless of whether the petitioner's underlying claims have merit. See *Addison*, 2023 IL 127119, ¶ 35 (holding that "harmless error analysis does not apply where compliance with Rule 651(c) is not shown[; rather] such compliance must be shown regardless of whether the claims made in the petition are viable"); see also *Madison*, 2023 IL App (1st) 221360, ¶ 48 (same); *People v. Suarez*, 224 Ill. 2d 37, 47 (2007) (holding that when postconviction counsel fails to fulfill his duties under Rule 651(c) remand is required "regardless of whether the claims raised in the petition had merit"; explaining that the "purpose" underlying the rule " is not merely formal" but to ensure that all petitioners "are provided proper representation when presenting claims of constitutional deprivation" (internal

quotation marks omitted)).

¶ 76    Accordingly, since we find that the record rebuts the presumption that counsel complied with Rule 651(c) by failing to amend the original petition to include any affidavits or other factual support for the claims raised in the petition, we reverse and remand to the circuit court for further second-stage proceedings and the appointment of new postconviction counsel.

¶ 77    Reversed and remanded with instructions.